## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUPERMEDIA LLC, | ) | Case No. 13-10546(KG) |
| | ) | |
| Reorganized Debtor. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| SUPERMEDIA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 15-50044(KG) |
| | ) | |
| YELLOW PAGES PHOTOS, INC., | ) | |
| | ) | |
| Defendant. | ) | **Re:  Dkt Nos. 171 & 180** |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## OPINION

In this tumultuous case and adversary proceeding, the time has come for a final decision on the merits following trial.  As explained below, matters took a serious turn based upon facts discovered and arguments made by new lead counsel for SuperMedia LLC ("SuperMedia") – facts and arguments which changed the complexion of the issues for the Court to decide and the outcome of the case.

## BACKGROUND[1]

On November 12, 2001, Yellow Pages Photos, Inc., ("Former YPPI"), now known as AdMedia Systems, Inc. ("AdMedia"), and Verizon Directories Corp. ("Verizon

---

[1]   A number of facts in this Opinion are repetition of the facts which appeared in the Court's Memorandum Opinion, dated December 29, 2014 (Lead Case - D.I. 220) and the Memorandum Opinion on the cross-motions for summary judgment, dated October 27, 2015 (Adv. - D.I. 115).

Directories") entered into a Service Contractor Agreement (the "Agreement").[2]  AdMedia

agreed to provide Verizon Directories with 100 CD's each containing 50 images (the

"Licensed Images") for Verizon Directories' use in accordance with an End User License

Agreement (the "License") which was attached to the Agreement.[3]  Verizon Directories

paid AdMedia $660,000 for the delivered Licensed Images.[4]  The Agreement contains,

*inter alia*, an anti-assignment clause providing that Former YPPI, now AdMedia, could

not "assign its rights or delegate its duties "without Verizon Directories' prior written

consent.[5]

In 2006, Verizon Directories changed its name to "Idearc Media Corp." ("Idearc").[6]

On November 3, 2006, former YPPI changed its name to "AdMedia Systems, Inc."  Trent

Moore, AdMedia's principal, incorporated a new Florida corporation named "Yellow

Pages Photos, Inc."[7]  In 2007, YPPI received from the Register of Copyrights copyright

registrations for the Licensed Images.[8]  AdMedia assigned its copyrights in the Licensed

Images to YPPI.[9]

---

[2] Pretrial Order ("PTO"), dated November 6, 2015 ¶ 2.  Adv. - D.I. 138.

[3] *Id.*, ¶ 3.

[4] *Id.*, ¶ 5.

[5] *Id.*, ¶ 6.

[6] *Id.*, ¶ 8.

[7] The Court will refer to the new company named "Yellow Pages Photos, Inc." as "YPPI."  It should be noted that although YPPI made reference to the change in a footnote to the brief following the Liability Trial, the Court did not appreciate the significance of the change and in its Memorandum Opinion on Yellow Pages Photos' Inc.'s Amended Motion for Allowance and Payment of Administrative Expense, the Court's references to YPPI were actually to Former YPPI.  <u>See</u> the Memorandum Opinion which accompanies this Opinion in which the Court denies YPPI's motion to amend its proof of claim to add AdMedia.

[8] PTO, ¶ 13, Ex. 1.

[9] *Id.*, ¶ 12.

On March 31, 2009, Idearc filed a voluntary Chapter 11 petition in the Bankruptcy Court for the Northern District of Texas.[10]  Then, on April 21, 2009, Idearc's claims and noticing agent served YPPI with notice of the bar date for claims of August 10, 2009.[11] Thereafter, on September 21, 2009, the noticing and claims agent sent a second notice to YPPI that it was a party to an executory contract with Idearc, that the contract was being assumed and how the cure amount could be found.[12]  The proposed cure amount for YPPI was $0.00, and YPPI did not object.[13]  The bankruptcy court confirmed Idearc's plan on December 22, 2009, including a provision that the cure amount was binding.[14]  Idearc emerged from bankruptcy as SuperMedia, LLC.

On February 16, 2010, YPPI brought a lawsuit in the United States District Court for the Middle District of Florida against User-Friendly Phone Book, LLC and ASEC Group LLC.  In the course of the lawsuit, YPPI learned that ASEC received copies of the Licensed Images from SuperMedia.  Therefore, on September 24, 2010, YPPI sent a letter to Super Media regarding SuperMedia's breaches and infringements.[15]

On March 18, 2013, SuperMedia and affiliates filed for bankruptcy under chapter 11 in the Court. YPPI immediately sought discovery under Rule 2004.  On May 30, 2013, after SuperMedia had emerged from its prepackaged bankruptcy, YPPI filed its proof of claim, as later amended, and Motion for Allowance and Payment of Administrative

---

[10] *Id.*, ¶ 15.
[11] Trial., Ex. 563, ¶ 10.
[12] *Id.*, ¶ 14.
[13] *Id.*, ¶¶ 14, 18, 20.
[14] *Id.*, ¶ 21.
[15] Trial, Ex. 27.

Expense Claim,[16] YPPI alleged that SuperMedia violated the transfer restriction in the License and infringed YPPI's copyrights.

The Court conducted a trial on the Motion for Administrative Expense on April 9, 10 and 11, 2014 (the "Liability Trial").[17]  Because of YPPI's concern that SuperMedia had neglected to provide all of the discovery YPPI had requested, YPPI asked the Court to bifurcate trial[18], which request the Court granted, trying only liability in the Liability Trial.

<u>The Liability Post-Trial Opinion</u>

On December 29, 2014, the Court issued its Post-Trial Opinion on Yellow Pages Photos, Inc.'s Amended Motion for Allowance and Payment of Administrative Expense (the "Liability Opinion").[19]  The Liability Opinion made it clear that the Court fully accepted YPPI's evidence at the trial that Super Media had breached the License pre-Petition.  The Court found that SuperMedia was not entitled to transfer YPPI's images and had done so, but because the transfers were accomplished pre-Petition, the Court had to deny the administrative claim.  In the Liability Opinion, the Court discussed the breaches of the License and the copyright infringement at length and concluded that the breaches and infringement had occurred pre-Petition.  Specifically, the Court found that SuperMedia had wrongfully transferred the Licensed Images to Tata, ASEC, AMDOCS, MPS, ASEC Asia and ASEC India.[20]  The Court found further breaches by transfers from

---

[16] Case 13-10545 - D.I. 213.
[17] Lead Case – D.I. 116, 134-136.
[18] Lead Case – D.I. 93.
[19] Adv. - D.I. 220.
[20] Liability Opinion, page 35.

SuperMedia to Web.com, Hostopia, Facebook and Google+.[21]  The Court found that the transfers were willful.[22]

However, as SuperMedia made clear in its Motion to Amend (discussed below), the pre-Petition period was not at issue in the Liability Trial.  What was at issue was the administrative claim period, *i.e.*, the 43 days between the date of SuperMedia's bankruptcy petition (March 18, 2013) and the effective date of its confirmed plan (April 30, 2013).  The Court therefore concluded that its rulings on pre-petition actions were not binding.

SuperMedia Adversary Proceeding

SuperMedia commenced an adversary proceeding on January 12, 2015.  In the adversary proceeding, SuperMedia sought a declaration that in the pre-Petition period SuperMedia had neither breached the License nor infringed the copyrights.[23]

Then, on September 4, 2015, SuperMedia filed a Second Amended Complaint[24] reflecting the following allegations:

    1.        Former YPPI changed its name to AdMedia, and Mr. Moore formed a new company, YPPI.  AdMedia assigned its copyrights to the Licensed Images to the newly formed YPPI.[25]

---

[21] Liability Opinion, pages 37-39.
[22] Liability Opinion, pages 45-46.
[23] Adv. – D.I. 1.
[24] Adv. – D.I. 80.
[25] Second Amended Complaint, ¶ 8.

2.     AdMedia and SuperMedia executed Amendment Number One in mid-2007 to the License to include contractors as authorized users of the Licensed Images.[26]

3.     The users of the Licensed Images, namely, Tata, AMDOCs, ASEC International, MPS, Hostopia, Web.com and bieMedia were authorized under the Amended License to use the Licensed Images.[27]

4.     The Idearc bankruptcy discharged YPPI's claim, as of December 31, 2009 for breach of contract or copyright infringement.[28]

On SuperMedia's motion[29], the Court found that the testimony at trial by Trent Moore was sanctionable as it related to bieMedia and ASEC and held that the Court would not accept damages evidence relating to bieMedia and ASEC.[30]   The Court also granted SuperMedia fees and expenses in bringing its Rule 60(b) motion.[31]

<u>Summary Judgment Motions</u>

YPPI and SuperMedia cross-moved for summary judgment.[32]  On the motions, the Court issued a Memorandum Opinion[33] holding that:

1.     Summary judgment was granted in favor of SuperMedia on the number of works involved, finding there was a single work.

---

[26] Second Amended Complaint, ¶¶ 16-19.
[27] Second Amended Complaint, ¶ 24.
[28] Second Amended Complaint, ¶ 28.
[29] Second Amended Complaint, ¶¶ 8, 25.
[30] Lead Case – D.I. 315.
[31] Lead Case – D.I. 366, Memorandum Opinion page 12.
[32] Adv. – D.I. 70, 71.
[33] Adv. – D.I. 115.

2.      SuperMedia's motion for summary judgment was denied on the issue of whether the Idearc bankruptcy discharged YPPI's claim. The Court instead found that the confirmation order in the Idearc bankruptcy did not discharge YPPI's claim.

3.      There was a factual issue on the existence of YPPI and AdMedia and whether YPPI became the "Contractor" based on the Amendment.

4.      Whether the statute of limitations impedes YPPI's claims was a disputed factual issue preserved for trial.

5.      Because YPPI did not dispute the 2005 and 2006 transfers to AMDOCS and ASEC, YPPI was foreclosed from statutory damages on those transfers.

Thereafter, YPPI moved for reconsideration of the Court's decision on summary judgment. As a result, the Court recognized its mistake on the "single work" and held that 100 works were involved. The Court also found that YPPI did in fact contest the 2005 and 2006 transfers and ruled that when the transfers to AMDOCS and ASEC occurred would be determined at trial.[34]

## DISCUSSION

The parties vigorously challenged one another during the three days of trial and then both briefed the trial results and on February 18, 2016, the Court heard post-trial

---

[34] Order on the Motion for Reconsideration, dated November 10, 2015, ¶¶ 1 and 2. Adv. - D.I. 137.

arguments.  In addition, the Court heard extensive argument on YPPI's Motion for Sanctions.  YPPI argued that the Court should make adverse inferences and hold that because of its non-compliance with discovery requests and Orders, the Court should hold that SuperMedia illegally transferred all 5,000 works multiple times.  The Court will now describe and explain its rulings.

<u>Copyright Infringement</u>

YPPI registered its copyrights in 2007.[35]  The Court finds that SuperMedia has met its burden of establishing that transfers to AMDOCS and ASEC (also recognizing that YPPI withdrew its request for statutory damages on the ASEC transfer) occurred in 2005 and 2006, prior to the registration by YPPI of its copyrights.  The Court accepts the testimony of Valerie Dale, a program manager for SuperMedia.  Ms. Dale testified at trial that Verizon (SuperMedia's predecessor) began outsourcing its services in 2005.  Ms. Dale testified that the program known as "APPL 1" was a project with AMDOCS and its partner, Office Tiger, LLC, that occurred in late 2005 or early 2006.[36]  Ms. Dale instructed other SuperMedia employees to deliver the YPPI images to Office Tiger on their trip to Chennai, India.[37]  Ms. Dale's testimony is supported by documentary evidence.  There is the APPL1 project plan[38] and the Statement of Work[39].

---

[35] PTO, ¶ 13.  Adv. - D.I. 138.
[36] 11/16/15 Tr., 78:8-22, 84:22-25.
[37] 11/16/15 Tr., 78:8-17, 99:15-17
[38] Trial Ex. 433, 11/16/15 Tr., 86:17-21
[39] Trial Ex. 451

Mr. Dale testified as follows:

> Q.    Ms. Dale, is there any doubt in your mind that the Verizon
>
> sent its print art library to Office Tiger in late 2005, early 2006?
>
> A.    No.[40]

Ms. Dale's unequivocal testimony is also supported by the record of the case

showing that Office Tiger began producing finished ads for SuperMedia in 2006 and

could not have done so without holding a copy of the art library.[41]

APPL2 followed APLL 1.   It started in early 2006.[42]   Under APLL 2, Verizon

transferred the YPPI images to ASEC International.[43]   Documents support the testimony

provided by Ms. Dale.   Again, Ms. Dale prepared APLL 2[44] and Statement of Work.[45]

The evidence supports SuperMedia's position that transfers occurred before YPPI

registered the copyrights.   Therefore, YPPI cannot seek statutory damages or attorneys'

fees under the Copyright Act.[46]

## Statute of Limitations

SuperMedia contends that YPPI's copyright claims are barred by the applicable

statute of limitations.   The Copyright Act provides for a three year statute of limitations.[47]

Texas has a four year limitations period which is tolled until plaintiff knew or should

---

[40] 11/16/15 Tr., 78:8-22.

[41] *Id.*, 99:5-17.

[42] *Id.*, 94:21-95:6

[43] *Id.*, 94:21-95:6, 95:7-10, 96:8-19

[44] Trial Ex. 434

[45] Trial Ex. 462

[46] *See Leonard v. Stemtech Health Sciences, Inc.*, 08-067-LPS-CJB, 2011 WL 6046701, at *12 (D. Del Dec. 5, 2011), adopted at 2012 WL 1133185 (D. Del. Mar. 28, 2012); and 17 U.S.C. § 412(2).

[47] 17 U.S.C. § 507.

have known of a claim.[48]  SuperMedia points to other licensees, User Friendly and ZipLocal, who YPPI sued in 2009 for outsourcing and production.[49]

The Court finds that YPPI first learned that SuperMedia was doing business with an outsourcer in the fall of 2010, and filed its proof of claim on May 30, 2013.[50]  Mr. Moore's knowledge of the transfers at issue was acquired within the three year statute of limitations.

SuperMedia points to several events which it claims put YPPI on notice of the acts of infringement. As examples, SuperMedia points to:

1.      SuperMedia in 2007 asked YPPI to amend the License to add third-party contractors as authorized users of the Licensed Images[51];

2.      On October 6, 2009, SuperMedia announced it would be engaging Tata to provide ad production services.[52]

3.      Further, SuperMedia released a Form 8-K disclosing outsourcing services.[53]  There is, however, no evidence that YPPI knew about the events or considered them in context.

These are modest events which did not put YPPI on notice of its claim.  Accordingly, the Court finds that YPPI filed within the statutory period of three years.

---

[48] Tex. Civ. Prac. & Rem. 15 Code Ann. § 16.004; *Hoover v. Gregory*, 835 S.W. 2d 668, 674 (Tex. App. 1992).
[49] 11/18/15 Tr., 23:13-24:9
[50] 11/18/15, 242:1-20, 246:8-247:4, 247:15-248:5, 248:16-249:23, Tr. Ex. 20
[51] Trial Ex. 55.
[52] Trial Ex. 468.
[53] Trial Exs. 449 and 459.

<u>YPPI's Participation in the License Agreement</u>

YPPI is not a party to the License Agreement and the Court has ruled in a separate Memorandum Opinion that it will deny YPPI's motion to amend the proof of claim to add AdMedia. Therefore, as a non-party, AdMedia does not have standing to enforce the License Agreement. YPPI cannot enforce the License Agreement, including the right to attorneys' fees.[54]

<u>The Idearc Bankruptcy</u>

The Court previously ruled that YPPI's claims were not subject to discharge under the Idearc bankruptcy Confirmation Order. SuperMedia insists that "YPPI is bound by the $0.00 cure amount provided in Idearc's executory contract schedules."[55] SuperMedia argues that YPPI received notice of the $0.00 cure about but took no action and therefore YPPI is barred from asserting claims for damages from transfers which occurred before December 31, 2009, the effective date of Idearc's Confirmation Order.

The Court's reasons for denying the application of discharge because of the Confirmation Order are the same for the cure amount arguments by SuperMedia. By providing a cure amount of $0.00, Idearc told YPPI that it had not breached the License Agreement – an executory contract – or committed patent infringement, which YPPI only discovered later. As the Court knows now, the executory contract was not with YPPI but with AdMedia; and AdMedia is not a claimant. Accordingly, whether the Idearc Confirmation Order discharged the damages to AdMedia or not is of no moment. What

---

[54] *Arlington Home, Inc. v. Peak Envtl. Consultants, Inc.*, 361 S.W. 3d 733, 783 (Tex. App. 2012).
[55] SuperMedia LLC's Post-Trial Brief, p. 35. Adv. Case D.I. 171.

11

matters is that the copyright infringement claim was neither discharged nor, for that matter, addressed in the notice.  The unknown copyright infringement merely survived the Idearc bankruptcy.

Damages

The Court has ruled that statutory damages are not available because the first transfer of the copyrighted Licensed Images pre-dated the registration of the copyrights. Therefore, the Court must determine YPPI's actual damages.

YPPI, supported by the expert testimony of Steven Oscher, claims that it is entitled to $132 per image which SuperMedia transferred.  YPPI argues that the $132 amount is what a reasonable license fee for the infringing use would be[56].  Mr. Oscher, a certified public accountant and economist,[57] opined that the most reliable measure was the amount SuperMedia paid to license the Licensed Images, which was $132 per image.  Mr. Oscher focused on transactions involving SuperMedia (2001 - $132 per image), SBC Services, Inc. (2003 - $100 per image) and AT&T (2007 - $100 per image and 2008 - $195 per image).[58]  All were large companies with large market penetration.[59]  The $132 per licensed image would translate to total actual damages of $2,668,248 without an adverse inference[60] and $5,940,000 with an adverse inference.

---

[56] *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001) (courts favor granting the copyright owner a full recovery); *Leonard v. Stemtech Health Sciences, Inc.*, 2013 WL 5311295, *6 (D. Del. Sept. 23, 2013) (actual damages are based on the fair market value that a plaintiff would obtain for use of the item).
[57] 11/18/15 Tr., 28:14-287:6.
[58] 11/18/15 Tr., 303:24-306:22, Tr. Exs. 55, 509 and 519.
[59] 11/18/15 Tr., 265:21-266:21.
[60] See pages 18-19, below.

SuperMedia proffered Ellen Broughn as its expert witness.  Ms. Broughn spent 40 years working in the stock photo industry[61] and has licensed in excess of one hundred thousand stock photos.[62] Ms. Broughn has a wide range of former customers including advertising agencies, magazines and phone directories companies.[63] Ms. Broughn testified that the fair-market value of a new royalty-free license for the Licensed Images – all 5,000 - is between $1,729 and $25,935,[64] which may show how market conditions have radically changed since 2001.  It has become a "buyers' market" because of inexpensive digital cameras, broadband internet and companies such as Shutterstock.[65] Ms. Broughn testified that more than 3,000 of the Licensed Images were not marketable[66] and that of the 1,729 remaining photos, the fair market value of a royalty free license was between $1 and $15, or $1,729 to $25,935.[67]

Mr. Moore's testimony at trial was also revealing.  Mr. Moore testified that no one ever told him that they would not purchase the Licensed Images from YPPI because they had already been published or obtained elsewhere.[68]  He has not sold a new license for his images since 2008.[69] He also testified that AT&T purchased 157 images for $195 each, for a total of $30,000.[70]

---

[61] 11/17/15 Tr., 113:20-23.
[62] *Id.*, 124:21-24.
[63] *Id.*, 125:2-9.
[64] *Id.*, 132:18-133:2, 175:9-21.
[65] *Id.*, 133:3-13, 139:18-140:11.
[66] *Id.*, 169:9-12, 172:9-16.
[67] *Id.*, 174:20-175:21.  In 2001, SuperMedia entered into a new license agreement with a company that was not YPPI.  SuperMedia paid $2 per image.  *Id.*, 65:2-10, 66:11-24, Trial Ex. 436.
[68] 11/18/15 Tr., 79:19-23.
[69] *Id.*, 223:12-20.
[70] *Id.*, 273:19-24.

The law in the Court's mind is clear that the proper focus is on the fair market value of the Licensed Images, and not on lost sales or opportunities.  Thus, in *On Davis* the Second Circuit allowed the fair market value of the copyrighted material to control.[71] *See also Deltak, Inc. v. Advanced Systems Inc.*,[72] wherein the Seventh Circuit held likewise.

Ms. Boughn's testimony, in summary, was that the price per image for a license from YPPI was between $4.50 and $8, regardless of a transfer restriction or not.[73]  Ms. Broughn also testified that the hypothetical license fee for a new license to all 5,000 of the Licensed Images would be between $1,729 and $25,935, which equates to $1 to $15 per image.[74]  Mr. Oscher for YPPI testified that the Licensed Images had a value of $132 per image, the price SuperMedia paid at the outset.

Neither expert fully satisfied the reality of the situation.  Mr. Oscher's valuation of $132 per image fails to take into account the market changes discussed above and the $132 per Licensed Image is more of a default than a value.  Ms. Boughn over-emphasized the quality of the images.[75]  Ms. Boughn also valued the images as of 2010,[76] ignoring the years from 2001 to 2009.

---

[71] *On Davis*, 246 F.3d at 166.
[72] 767 F.2d 357, 260 (7th Cir. 1985).
[73] 11/17/15 Tr., 131:7-132:2.
[74] *Id.*, 175:9-14, 199:7-9.
[75]   The Licensed Images which Ms. Boughn reviewed were not in the same format that YPPI (Former YPPI) sold to SuperMedia.  The Court will also ignore Ms. Boughn's valuation reduction on the basis that the Licensed Images did not bear releases, a fact not proven.  Therefore, all 5,000 images are in play.
[76] 11/17/15 Tr., 179:17-183:1.

The experts help is therefore limited.[77]  The $132 figure is unreasonably high given the realities of the stock image business.  In fact, despite repeated efforts by YPPI, SuperMedia rejected any further purchases after the Agreement in 2001.[78]  Moreover, Mr. Oscher was not a strong expert and his testimony must be discounted.  Mr. Oscher has no experience in the stock imaging business.[79]  Mr. Oscher also selected comparables which were skewed in favor of a high value.[80]  His opinion was essentially mathematical – he took the price of the Licensed Images that Verizon paid and multiplied that dollar amount ($132) by the 5,000 images for the transfers.

The Court was, however, impressed with Ms. Boughn's expertise and testimony.  As noted earlier, Ms. Boughn has worked for 40 years in the stock photograph industry, having worked at eight stock photography companies.[81]  She has reviewed more than four million stock photos to determine whether such photos had commercial appeal for use in advertising.[82]  She has licensed more than one hundred thousand stock photos.[83]  Ms. Boughn opined that the fair market value of a royalty free license for the Licensed Images was between $1 and $15 each.[84]  Ms. Boughn did not give her opinion of the value or values prior to 2010.

---

[77]  The Court will not take notice of Figure 2 in SuperMedia's brief, as it references facts which were not in evidence at the trial.  Figure 2 contains YPPI licenses to other parties.

[78]  11/18/15 Tr., 36:20-37:2, 39:18-43:8, 43:13-21. 274:3-25.

[79]  *In Banker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352-354 (S.D.N.V. 2003), the court struck the testimony of an expert because she did not have "knowledge, skill, experience, training or education in the licensing of stock photography to qualify as an expert in that area."

[80]  Mr. Oscher focused on the Verizon license, the SBC license and the AT&T license.  11/18/15 Tr., 304:3-305:5.  Mr. Oscher failed to focus on other licenses at lower prices.

[81]  11/17/15 Tr., 113:20-23, 114:12-122:22.

[82]  *Id.*, 118:2-21.

[83]  *Id.*, 124:21-24.

[84]  *Id.*, 174:20-175:21.

Given the facts of the case and that in 2011 SuperMedia contracted for stock images for $20,000, or approximately $2 per image[85], the Court concludes that it will use $15 per image as the fair market value for the Licensed Images throughout the period from 2001 to 2011 when SuperMedia removed the Licensed Images from its print library.[86]  The $15 per image price is the top of Ms. Broughn's range, and more than accounts for the pre-2010 period for which Ms. Broughn did not express an opinion.

What remains for the Court to determine is how many copies of the Licensed Images SuperMedia infringed upon.  This is a difficult formulation, as discussed below. It is further complicated by the YPPI request for an "adverse inference" based on SuperMedia's alleged discovery violations.

The Court will begin the discussion of the number of infringements with its decision on the "adverse inference" request.  In early 2011, YPPI learned that SuperMedia had transferred the Licensed Images to third parties.[87]  YPPI then wrote to SuperMedia, asking SuperMedia to identify transferees and take steps to have the Licensed Images returned or destroyed.[88]

On April 18, 2013, YPPI filed a Rule 2004 request in SuperMedia's bankruptcy case. On May 30, 2013, YPPI filed its Motion for Allowance and Payment of Administrative Expense Claim.[89]  On December 30, 2013, YPPI served its first document request.[90]

---

[85] 11/16/15 Tr., 65:2-10, Trial Ex. 436.
[86] April 10, 2014 Tr., 73:6-16.
[87] 11/18/15 Tr., 959:16-962:16
[88] Trial Exs. 20 and 22.
[89] Case 13-10545 - D.I. 213.
[90] Adv. - D.I. 30, 31.

SuperMedia failed to produce anything related to digital advertising. The Court thereafter ordered SuperMedia to produce such discovery.[91] On February 12, 2014, the Court sanctioned SuperMedia for its failure.[92] The Court compelled SuperMedia to comply with its prior orders and allowed YPPI to make application for fees and expenses on the effort to compel SuperMedia's compliance.

On May 29, 2015, SuperMedia filed a letter with the Court offering to retain a third-party vendor to search for Licensed Images through SuperMedia's existing digital ads. The Court thereafter held a telephone conference and at the conclusion held that if SuperMedia performed the search, there would not be additional sanctions.[93]

SuperMedia then performed the search through Idée, Inc. ("TinEye") at its cost (reported to be approximately $70,000). TinEye found 57 Licensed Images out of over one million images searched on SuperMedia websites, or 0.0053% of the images used in SuperMedia's websites.

The results of the TinEye search could not have been news to YPPI. Its expert, Adam Sharp, had been searching the Internet regularly since 2012 for the Licensed Images.[94] Mr. Sharp at regular intervals searched for all 5,000 Licensed Images using a reverse image platform.[95] Mr. Sharp, despite his years of searching, found no evidence that SuperMedia published more than 60 images to the Internet.[96]

---

[91] 1/29/14 Tr., 12:4-18.
[92] 2/12/14 Tr., 29:23-30:12
[93] 6/9/15 Tr., 31:4-10.
[94] Sharp Dep. Tr., 78:15-18, 83:16-23.
[95] *Id.*, 57:23-58:6, 78:10-14.
[96] 11/18/15 Tr., 152:22-153:9.

YPPI has asked the Court for an adverse inference against SuperMedia – that all 5,000 Licensed Images were unlawfully used by or on behalf of third parties.  An adverse inference is an extreme remedy.[97]  A party must show: "(1) the evidence was in the party's control, (2) the evidence is relevant, (3) there was withholding of the evidence, and (4) the duty to preserve evidence was forseeable."[98]  In turn, "control" means that a party has "the legal right, authority, or practical ability" to obtain evidence because of its relationship with the party who possesses the evidence.[99]  SuperMedia did not and does not have the authority to obtain the documents.  Indeed, if SuperMedia had the capacity to obtain digital ads documents, it would not have had to hire TinEye at great cost.

Similarly, YPPI failed to convince the Court that SuperMedia's conduct amounted to fraud or an intentional action.  Such bad faith is critical to gaining the adverse inference.[100]  SuperMedia did not have a duty or ability to preserve the digital documents. The very few Licensed Images discovered by TinEye or Mr. Sharp makes the effort unsustainable.  Lastly, there was a lack of evidence – concrete evidence – that the alleged spoliation of evidence would have been useful or helpful.[101]

The Court therefore has determined that it will not adversely infer that SuperMedia transferred the Licensed Images to Web.com, Hostopia, Facebook, Google+,

---

[97] *McAdams v. United States*, 297 F. App'x 183, 187 (3d Cir. 2006).

[98] *Bell v. United Parcel Serv., Inc.*, 665 F.3d 73 (3d Cir. 2012).

[99] *R.F.M.A.S., Inc. v. Mimi SO*, 271 F.R.D. 13, 24 (S.D.N.Y.) opinion adopted, 271 F.R.D. 55 (S.D.N.Y. 2010).

[100] *Bull*, 665 F.3d at 79.  *See also In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568, 579 (3d Cir. 2007) (no evidence of intentional destruction of documents, therefore no spoliation); *United States v. Nelson*, 481 F. App'x 40, 42 (3d Cir. 2012) (spoliation instruction improper without showing that evidence is destroyed).

[101] *In re Adams Golf, Inc., Sec. Litig.*, 618 G. Supp. 2d 343 (D. Del 2009) (need concrete evidence which suggests that the lost documents would have been favorable).

SuperMedia's customers and the general public.  Web.com and Hostopia confirmed that SuperMedia never transferred the Licensed Images to them.[102]  TinEye found only seven Licensed Images on Facebook, six on Google+ and 57 over all of SuperMedia's digital products.[103]  It would be foolish to adversely infer the transfer of 5,000 Licensed Images multiple times on these facts.

Having rejected YPPI's claim for adverse inference, the Court must now decide how many of the Licensed Images were actually transferred and therefore subject to the $15 per Licensed Image transferred.  The following chart contains the Court's analysis:

| Transferee | Images Transferred | Dollar Amount |
|---|---|---|
| AMDOCS | 5,000 | $ 75,000 |
| Office Tiger | 5,000 | $ 75,000 |
| Tata | 5,000 | $ 75,000 |
| MPS | 5,000 | $ 75,000 |
| Web.com/Hostopia | 85 | $  1,275 |
| Facebook | 10 | $    150 |
| Google+ | 11 | $    165 |
| SuperMedia Customers | 90 | $  1,350 |
| General Public | 18 | $    270 |
| **Total** | **20,214** | **$303,210** |

SuperMedia argued that there were no damages to which YPPI was entitled.  YPPI urged the Court to accept $132 per image, where for the bottom of the range the amount would be $2,668,248.  With the adverse inference such that all 5,000 Licensed Images were transferred to all parties, the amount of actual damages is $5,940,000.  Had the Court allowed statutory damages, the range using YPPI's numbers would be from $75,000, to

---

[102] Oklevitch Dep. Tr., 29:21-30:7, 43:1-5; Mays Dep., 19-40:18.
[103] TinEye Report, Tr. Ex. 495, 4-6.

$3,000,000 (using $30,000/100 works), to $15,000,000 if the Court found willful infringement (using $15,000/100 works).

What happened in this case, is that the date of the first transfers was advanced to 2005-2006 thereby eliminating statutory damages, and the Court concluded that the fair market value of each image was far less than the price SuperMedia (then Verizon) paid YPPI. Using $15 as the value of the Licensed Images rather than $132 per Licensed Image as YPPI insisted results in a greatly reduced damages amount. At the same time, the Court recognizes that SuperMedia did in fact transfer the Licensed Images in such a way as to constitute copyright infringement. Thus, while the damages which YPPI suggests are highly inflated, the Court finds that YPPI suffered actual damages.

## CONCLUSION

The Court has rendered its decision. YPPI is not entitled to statutory damages. YPPI's actual damages, without adverse inference, are $303,210. The Court will issue an Order in conformity with this Opinion.


Dated: April 4, 2016

_____
KEVIN GROSS, U.S.B.J.